## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 11-07410 |
| COLLECTORS TRAINING INSTITUTE | ) | |
| OF ILLINOIS, INC., | ) | Hon. John H. Squires |
| | ) | |
| Debtor. | ) | **Hearing Date: November 15, 2011** |
| | ) | **Hearing Time: 9:30 a.m.** |

**FINAL STIPULATION AND AGREED ORDER FOR USE OF CASH
COLLATERAL TO (A) OPERATE DEBTOR'S BUSINESS;  (B) PAY FEES AND
COSTS OF TRUSTEE AND HER PROFESSIONALS; AND (C) AUTHORIZE
PERIODIC DISTRIBUTION OF COLLATERAL PROCEEDS TO BANK**

Bank of America, N.A. (the "**Bank**") and Frances Gecker, not individually but as

chapter 7 trustee (the "**Trustee**") for the bankruptcy estate of Collectors Training Institute

of Illinois, Inc., the debtor (the "**Debtor**") in the above-captioned chapter 7 case (the

"**Chapter 7 Case**"), by and through their respective attorneys, enter into this Stipulation

and Agreed Order For the Use of Cash Collateral to (A) Operate Debtor's Business; (B)

Pay Fees and Costs of Trustee and Her Professionals; and (C) Authorize Periodic

Distribution of Collateral Proceeds To Bank (the "**Agreed Order**"), and hereby state as

follows:

### Recitals

A.      On February 24, 2011 (the "**Petition Date**"), the Debtor filed a voluntary

petition for relief under title 11 of the United States Code (the "**Bankruptcy Code**") in

the United States Bankruptcy Court for the Northern District of Illinois (the "**Court**"),

commencing a chapter 11 case (the "**Chapter 11 Case**").  On October 6, 2011 (the

"**Conversion Date**"), the Court entered an order converting the Chapter 11 Case into a

case under chapter 7 of the Bankruptcy Code.  The Court further ordered the appointment

of the Trustee to administer the estate of Debtor in the Chapter 7 Case.

B.      The Debtor's business is debt collection.  Pursuant to a contract with the

City of Chicago, the Debtor employs non-violent offenders post-incarceration to collect

various City receivables, including fines for traffic violations.  In the past, the Debtor has

also collected debts on behalf of other municipal and private entities.  On October 25,

2011, the Court entered the *Order Authorizing the Trustee to Operate the Debtor's*

*Business* (Docket No. 66), pursuant to which the Trustee has been granted the authority,

pursuant to section 721 of the Bankruptcy Code, to operate the Debtor's business through

January 31, 2012.

C.      On November 15, 2011, the Court entered an order authorizing the Trustee

to retain attorneys or other professionals pursuant to section 327 of the Bankruptcy Code

(the "**Trustee's Professionals**") to advise the Trustee in the operation of Debtor's

business and liquidation of Debtor's other assets, in order to generate proceeds to be used

to pay the Bank on its claim against Debtor (as described below) as well as the claims of

other creditors.

D.      The Debtor's assets consist of its equipment, furniture, cash, receivables

and all other property, within the meaning of section 541 of the Bankruptcy Code, listed

in the Debtor's bankruptcy petition and schedules or otherwise within the scope of the

Debtor's estate (collectively, the "**Estate Property**").

E.      The Bank alleges that on or about October 22, 2007, the Debtor and Bank

entered into that certain loan agreement (as amended or modified, the "**Loan**

**Agreement**"), pursuant to which the Bank provided to Debtor a line of credit in the

2

amount of $350,000.00 (the "**Loan**"). A copy of the Loan Agreement is attached as

Exhibit A. The Loan Agreement provides that the interest rate is the "Bank's Prime

Rate." Exhibit A at 1. The Loan Agreement provides that the Debtor shall reimburse

Bank for reasonable costs and attorneys' fees incurred by the Bank in connection with

enforcing the Loan Agreement, including enforcement of the Bank's rights in any

bankruptcy case. *See* Exhibit A at 9.

  F.  The Bank further alleges that on or about October 22, 2007, the Debtor

and Bank entered into that certain security agreement (as amended or modified, the

"**Security Agreement**"), in order to establish the Bank's rights in collateral to secure all

of Debtor's indebtedness to Bank. A copy of the Security Agreement is attached as

Exhibit B. On October 26, 2007, the Bank filed a UCC financing statement with the

Illinois Secretary of State (filing number 12628838), naming the Debtor as "Debtor" and

Bank as "Secured Party" (the "**UCC-1**"). A copy of the UCC-1 is attached as Exhibit C.

The UCC-1 stated that it covered the following collateral:

> The following described property now owned or hereafter acquired by the
> Debtor ("Collateral"): All accounts, contract rights, chattel paper,
> instruments, deposit accounts, letter of credit rights, payment intangibles
> and general intangibles, including all amounts due to the Debtor from a
> factor; rights to payment of money from bank under any Swap Contract;
> and all returned or repossessed goods which, on sale of lease, resulted in
> an account or chattel paper. All inventory, including all materials, work in
> process and finished goods. All machinery, furniture, fixtures and other
> equipment of every type now owned or hereafter acquired by the Debtor,
> (including, but not limited to, the equipment described in the attached
> Equipment Description, if any). All negotiable and nonnegotiable
> documents of title covering any Collateral. All accessions, attachment and
> other additions to the Collateral, and all tools, parts and equipment used in
> connection with the Collateral. All substitutes and replacements for any
> Collateral, all cash or non-cash proceeds, product, rents and profits of any
> Collateral, all income, benefits and property receivable on account of the
> Collateral, all rights under warranties and insurance contracts, letters of
> credit, guaranties or other supporting obligations covering the Collateral,

3

and any causes of action relating to the Collateral.  All books and records pertaining to any Collateral including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

See Exhibit C.

The description of the "Collateral" in the UCC-1 is substantially identical with that set forth in the Security Agreement. See Exhibit B at 1.

G.     The Bank further alleges that on or about February 1, 2010, the Debtor and Bank entered into that certain loan modification (the "**Loan Modification**" and, with the Loan Agreement, the Security Agreement, the UCC-1, and all related documents, the "**Loan Documents**").  A copy of the Loan Modification is attached as Exhibit D.  Among other things, the Loan Modification reset the interest rate as "Bank's Prime Rate plus 4.00 per annum" and extended the maturity date of the Loan to January 22, 2011.  Exhibit D at 1.  In addition, pursuant to the Loan Modification, the Debtor confirmed all security interests and liens theretofore granted by Debtor to Bank.  *Id.* at 2.

H.     Pursuant to the Loan Documents, the Debtor's indebtedness to the Bank is secured by certain collateral consisting of, among other things, valid, perfected, and first priority liens on the Debtor's receivables (the "**Receivables**"), equipment, inventory, and substantially all property of the Debtor, including the cash proceeds thereof.

I.     The Bank further alleges that, as of the Petition Date, the Debtor was indebted to the Bank in the amount of not less than $376,134.21 in principal and interest due, plus pre-petition attorney's fees and costs and post-petition interest, attorney's fees and costs.  The term "**Bank Debt**" herein shall mean all of Debtor's indebtedness to the Bank as of the Petition Date plus all interest and reimbursable costs and expenses to the extent permitted to the Bank under Section 506(b) of the Bankruptcy Code.

4

J.    After the Petition Date, the Debtor used the Bank's cash collateral to operate its business and fund chapter 11 administrative expenses without obtaining either the Bank's consent or this Court's approval as required under 11 U.S.C. § 363(c).

K.    Section 363(c)(2) of the Bankruptcy Code prohibits a trustee from using cash collateral unless each entity that has an interest in the cash collateral consents or the Court approves such use of cash collateral. Section 506(c) of the Bankruptcy Code permits a trustee to recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving or disposing of such property to the extent of any benefit to the holder of such claim.

L.    As of November 8, 2011, the Trustee possesses approximately $41,000, representing proceeds of Receivables that the Debtor had collected after the Petition Date and delivered to the Trustee after the Conversion Date less operating costs paid by the Trustee with the Bank's authorization (together with all interest accrued thereon, the **"Initial Cash Collateral"**).

M.    The Bank and the Trustee desire that the Trustee retain the Initial Cash Collateral to create an initial operating fund for the Debtor's business and to fund administrative expenses for the liquidation of other Bank Collateral (as defined below) and Estate Property throughout the Chapter 7 Case. The Bank and the Trustee further desire that: (a) the Trustee be authorized to retain a portion of additional cash proceeds generated from collection of Receivables and from the liquidation of other Bank Collateral during the Chapter 7 Case (the **"Additional Cash Collateral"** and together with the Initial Cash Collateral the **"Cash Collateral"**) as a reserve to fund further administrative costs of the Estate while remitting to the Bank proceeds in excess of such

5

reserve to apply to the Bank Debt; and (b) the Bank be given a lien on all property of the

Debtor's Estate not currently constituting Bank Collateral, solely for purposes of securing

the repayment of the Cash Collateral that the Trustee uses to fund expenses and costs that

are not directly related to the preservation or liquidation of the Bank Collateral.

**WHEREFORE, THE PARTIES HERETO AGREE AND STIPULATE,**

**AND THE COURT HEREBY ORDERS, THAT:**

1.    Pursuant to the Loan Documents, the Debtor's indebtedness to the Bank is

secured by valid, perfected, and first priority liens on all of the collateral described in the

Loan Documents, including the Receivables, equipment, inventory, substantially all

property of the Debtor, and the cash proceeds thereof, and any Avoidance Actions as to

which the Bank may be entitled to assert a security interest under the Loan Documents,

but in no event including Preference Recoveries (defined below); it being understood that

the Trustee disputes the validity of any security interest asserted by the Bank in any

Avoidance Claims (defined below) other than actions to avoid and recover post-petition

transfers of property pursuant to sections 549 and 550 of the Bankruptcy Code

(collectively, the "Bank Collateral").

2.    Pursuant to section 506(c) of the Bankruptcy Code and subject to the

provisions of this Agreed Order: (a) the fees, costs, and expenses of (i) the Trustee,

including fees payable to the Trustee pursuant section 326 of the Bankruptcy Code, and

(ii) the Trustee's Professionals; and (b) all other fees, costs, and expenses of

administering the Debtor's Estate and operating the Debtor's business (collectively, the

**"Estate Expenses"**), as set forth in the initial monthly budget attached hereto as Exhibit

E (initially and as revised by the Trustee each month during the term of this Agreed

Order, the "Budget"), shall be paid from the Cash Collateral set aside as the Cash Collateral Reserve (as defined herein) upon the approval by the Court of the fee applications of the Trustee and the Trustee's Professionals, and for payment in the ordinary course of such Estate Expenses with respect to payment of which Court approval is not required.

3.   On the tenth day after the entry of this Agreed Order, the Trustee shall remit to the Bank all Cash Collateral it holds in excess of an initial operating reserve of $66,875.00, which amount exceeds the Budget by approximately 10% (the "**Initial Operating Reserve**").

4.   On the first business day of each month starting on December 1, 2011 or as soon as practicable thereafter, and continuing each month thereafter through the earliest to occur of the dismissal of this Chapter 7 Case, its conversion into a case under chapter 11 of the Bankruptcy Code (unless the Trustee is appointed Chapter 11 trustee as forth in paragraph 11 below), or satisfaction of the Bank Debt (such earliest date being the "**Termination Date**"), the Trustee shall revise the Budget to reflect the Trustee's estimate (the "**Estate Expenses Estimate**") of all the Estate Expenses the Trustee expects in good faith to incur within the next month to liquidate or preserve the Bank Collateral or otherwise administer the Estate and operate the Debtor's business.  The amount of each monthly Budget plus 10% of such amount shall be referred to herein as the "**Continuing Reserve**."  Also on the first business day of each month starting on December 1, 2011 or as soon as practicable thereafter, and continuing each month thereafter through the Termination Date, the Trustee shall determine how much Cash Collateral is in its possession (the "**Continuing Cash Collateral Amount**").  If the

Continuing Cash Collateral Amount exceeds the Continuing Reserve, the Trustee shall remit the difference (the "**Cash Surplus**") to the Bank on or before the tenth business day of such month.   If the Continuing Cash Collateral Amount is less than the Continuing Reserve, the Trustee shall retain 100% of any Cash Collateral collected or received by Trustee until there is a Cash Surplus in the applicable subsequent month. The Trustee shall provide to Bank a report (the "**Cash Report**") of the calculations described in this paragraph on or before the tenth business day of the month in which such calculations are made.   Upon request of the Bank, the Trustee shall meet and confer with the Bank regarding any concerns, comments, or questions the Bank may have as to any Estate Expenses Estimate or Cash Report for any period.

5.    At the earliest to occur of the dismissal of this Chapter 7 Case or its conversion to a case under chapter 11 of the Bankruptcy Code (unless the Trustee is appointed Chapter 11 trustee as forth in paragraph 11 herein), the Trustee, after all outstanding and approved Estate Expenses have been paid in full, shall remit to the Bank all of the remaining sums held in the Continuing Reserve up to the remaining amount of the Bank Debt.  Any Cash Collateral remaining after payment of Estate Expenses and the Bank Debt shall be retained by the Trustee for distribution in accordance with the provisions of the Bankruptcy Code.

6.    To the extent the Trustee realizes cash proceeds from sources other than Bank Collateral (collectively, "**Non-Bank Collateral**"), the Trustee shall use such proceeds to pay Estate Expenses unrelated to the liquidation or preservation of Bank Collateral before resorting to use of Cash Collateral and further shall reflect that use in any Cash Reports.  Non-Bank Collateral shall not be used to preserve or liquidate Bank

8

Collateral; to the extent any such use occurs the Trustee shall reimburse the Estate from Cash Collateral. Cash Collateral may be used to liquidate Non-Bank Collateral, provided such anticipated use is disclosed to the Bank and provided further that the Trustee shall use Non-Bank Collateral proceeds to reimburse the Cash Collateral Reserve for Cash Collateral used to liquidate such Non-Bank Collateral.

7.   For purposes hereof, **"Avoidance Claims"** shall mean all claims and causes of action of Debtor or the Debtor's estate for money or property recovered pursuant to Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, including Debtor's rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) before deduction of any costs of collecting said money or property including reasonable attorney fees and costs. For purposes hereof, **"Preference Recoveries"** shall mean any and all recoveries of money or property for the Estate pursuant to Sections 547 or 550 of the Bankruptcy Code. To the extent the Trustee uses Cash Collateral to pay attorney fees and costs incurred in collecting, pursuing or liquidating Non-Bank Collateral, including Avoidance Claims, and recovers such fees and costs from third parties, such recovered fees and costs shall be added to the Cash Collateral Reserve

8.   Pursuant to Section 363(c)(2) of the Bankruptcy Code, the Bank consents to the use of its Cash Collateral to reimburse the Estate Expenses approved by the Court, or otherwise paid in the ordinary course of operating the Debtor's business, subject to the terms hereof. Solely to the extent the Trustee incurs Estate Expenses for purposes other than liquidating or preserving Bank Collateral, such as to

pursue or liquidate Non-Bank Collateral, and uses Cash Collateral to pay such expenses, the Bank shall be entitled to adequate protection for such use of its Cash Collateral (the "**Adequate Protection Claim**"). To secure the Adequate Protection Claim, and solely to the extent thereof, the Bank is hereby granted a replacement lien upon all of the Debtor's property and assets, of any kind or nature whatsoever, whether now owned or hereafter acquired by the Debtor or the estate, whether part of the Bank Collateral or not, and upon all of the estate's causes of action and the proceeds thereof.

9.   Nothing herein shall be deemed to prejudice or limit the Bank's right to request by motion a termination of further use of its Cash Collateral by the Trustee; provided, however, that in the event of any such termination, all Estate Expenses incurred prior to the date of such termination shall be paid (a) first from Non-Bank Collateral, solely to the extent such Expenses relate to matters unrelated to the liquidation or preservation of Bank Collateral, and only then (b) from Cash Collateral, subject only to the Bank's right to evaluate the reasonableness of Estate Expenses under the criteria of section 330 and other applicable provisions of the Bankruptcy Code.

10.   The Bank reserves all of its rights to review and object to the reasonableness of the fee applications of the Trustee and the Trustee's Professionals according to the criteria set by section 330 and other applicable provisions of the Bankruptcy Code.

11.   The automatic stay established by section 362 of the Bankruptcy Code shall be modified to the extent necessary to implement the provisions of this Agreed Order, including the distributions to the Bank authorized hereby. The Bank shall be conclusively presumed to have requested adequate protection as of the Petition Date and

the automatic stay shall be deemed lifted as to all Bank Collateral effective as of the date of the entry of this Agreed Order solely to the extent necessary to effect the express provisions hereof.

12.    If, while this Agreed Order is in effect, the Chapter 7 Case is converted to a case under chapter 11 of the Bankruptcy Code and if upon such conversion the Trustee is appointed the chapter 11 trustee of the Debtor's estate in such chapter 11 case, then the terms of this Agreed Order shall remain in effect for so long as: (a) such chapter 11 trustee remains in custody of the Debtor's estate; and (b) either (i) the Bank Claim remains unsatisfied or (ii) amounts due to Bank hereunder remain unpaid.

13.    This Agreed Order may be executed in any number of counterparts, each of which counterparts, when so executed and delivered (including by facsimile transmission or electronic mail), shall be deemed an original, and all of which counterparts, taken together, shall constitute one and the same Agreed Order.

14.    The Trustee has provided notice of the hearing on the Agreed Order to the Debtor, the office of the United States Trustee, all of the Debtor's known secured creditors, the list of the Debtor's 20 largest unsecured creditors and all parties that have requested notice of pleadings filed in the Bankruptcy Case, which notice is approved as adequate under the circumstances.

Dated: November 22, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

**STIPULATED AND AGREED:**

**FRANCES GECKER**, As Chapter 7
Trustee For The Bankruptcy Estate Of
Collectors Institute Of Illinois, Inc.

**BANK OF AMERICA, N.A.**

By:   /s/ Micah R. Krohn
      One of her attorneys

By:   /s/ Christopher M. Cahill
      One of its attorneys

Dated: November 15, 2011

Dated: November 15, 2011

Frances Gecker (IL Bar No. 6198450)
Micah R. Krohn (IL Bar No. 6217164)
FRANK/GECKER LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois  60654
Telephone:     (312) 276-1400
Facsimile:     (312) 276-0035

Christopher M. Cahill (Atty No. 6257370)
LOWIS & GELLEN, LLP
200 West Adams
Suite 1900
Chicago, IL  60606
Telephone:     (312) 364-2500
Facsimile:     (312) 364-1003

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 11-07410 |
| COLLECTORS TRAINING INSTITUTE | ) | |
| OF ILLINOIS, INC., | ) | Hon. John H. Squires |
| | ) | |
| Debtor. | ) | **Date: November 15, 2011** |
| | ) | **Time: 9:30 a.m.** |

**STIPULATION AND AGREED ORDER FOR USE OF CASH COLLATERAL TO
(A) OPERATE DEBTOR'S BUSINESS; (B) PAY FEES AND COSTS OF
TRUSTEE AND HER PROFESSIONALS; AND (C) AUTHORIZE PERIODIC
DISTRIBUTION OF COLLATERAL PROCEEDS TO BANK**

Bank of America, N.A. (the "**Bank**") and Frances Gecker, not individually but as

chapter 7 trustee (the "**Trustee**") for the bankruptcy estate of Collectors Training Institute

of Illinois, Inc., the debtor (the "**Debtor**") in the above-captioned chapter 7 case (the

"**Chapter 7 Case**"), by and through their respective attorneys, enter into this Stipulation

and Agreed Order For the Use of Cash Collateral to (A) Operate Debtor's Business; (B)

Pay Fees and Costs of Trustee and Her Professionals; and (C) Authorize Periodic

Distribution of Collateral Proceeds To Bank (the "**Agreed Order**"), and hereby state as

follows:

<u>Recitals</u>

A.      On February 24, 2011 (the "**Petition Date**"), the Debtor filed a voluntary

petition for relief under title 11 of the United States Code (the "**Bankruptcy Code**") in

the United States Bankruptcy Court for the Northern District of Illinois (the "**Court**"),

commencing a chapter 11 case (the "**Chapter 11 Case**").  On October 6, 2011 (the

"**Conversion Date**"), the Court entered an order converting the Chapter 11 Case into a

case under chapter 7 of the Bankruptcy Code. The Court further ordered the appointment of the Trustee to administer the estate of Debtor in the Chapter 7 Case.

B.      The Debtor's business is debt collection. Pursuant to a contract with the City of Chicago, the Debtor employs non-violent offenders post-incarceration to collect various City receivables, including fines for traffic violations. In the past, the Debtor has also collected debts on behalf of other municipal and private entities. On October 25, 2011, the Court entered the *Order Authorizing the Trustee to Operate the Debtor's Business* (Docket No. 66), pursuant to which the Trustee has been granted the authority, pursuant to section 721 of the Bankruptcy Code, to operate the Debtor's business through January 31, 2012.

C.      The Trustee has not yet applied to this Court for authority to retain attorneys or other professionals pursuant to section 327 of the Bankruptcy Code (the "**Trustee's Professionals**") to advise the Trustee in the operation of Debtor's business and liquidation of Debtor's other assets, in order to generate proceeds to be used to pay the Bank on its claim against Debtor (as described below) as well as the claims of other creditors. However, it is contemplated by Bank and Trustee that Trustee will seek authorization to employ and will employ Trustee's Professionals.

D.      The Debtor's assets consist of its equipment, furniture, cash, receivables and all other property, within the meaning of section 541 of the Bankruptcy Code, listed in the Debtor's bankruptcy petition and schedules or otherwise within the scope of the Debtor's estate (collectively, the "**Estate Property**").

E.      The Bank alleges that on or about October 22, 2007, the Debtor and Bank entered into that certain loan agreement (as amended or modified, the "**Loan**

2

Agreement"), pursuant to which the Bank provided to Debtor a line of credit in the

amount of $350,000.00 (the "**Loan**"). A copy of the Loan Agreement is attached as

Exhibit A. The Loan Agreement provides that the interest rate is the "Bank's Prime

Rate." Exhibit A at 1. The Loan Agreement provides that the Debtor shall reimburse

Bank for reasonable costs and attorneys' fees incurred by the Bank in connection with

enforcing the Loan Agreement, including enforcement of the Bank's rights in any

bankruptcy case. *See* Exhibit A at 9.

F.       The Bank further alleges that on or about October 22, 2007, the Debtor

and Bank entered into that certain security agreement (as amended or modified, the

"**Security Agreement**"), in order to establish the Bank's rights in collateral to secure all

of Debtor's indebtedness to Bank. A copy of the Security Agreement is attached as

Exhibit B. On October 26, 2007, the Bank filed a UCC financing statement with the

Illinois Secretary of State (filing number 12628838), naming the Debtor as "Debtor" and

Bank as "Secured Party" (the "**UCC-1**"). A copy of the UCC-1 is attached as Exhibit C.

The UCC-1 stated that it covered the following collateral:

> The following described property now owned or hereafter acquired by the
> Debtor ("Collateral"): All accounts, contract rights, chattel paper,
> instruments, deposit accounts, letter of credit rights, payment intangibles
> and general intangibles, including all amounts due to the Debtor from a
> factor; rights to payment of money from bank under any Swap Contract;
> and all returned or repossessed goods which, on sale of lease, resulted in
> an account or chattel paper. All inventory, including all materials, work in
> process and finished goods. All machinery, furniture, fixtures and other
> equipment of every type now owned or hereafter acquired by the Debtor,
> (including, but not limited to, the equipment described in the attached
> Equipment Description, if any). All negotiable and nonnegotiable
> documents of title covering any Collateral. All accessions, attachment and
> other additions to the Collateral, and all tools, parts and equipment used in
> connection with the Collateral. All substitutes and replacements for any
> Collateral, all cash or non-cash proceeds, product, rents and profits of any
> Collateral, all income, benefits and property receivable on account of the

3

Collateral, all rights under warranties and insurance contracts, letters of
credit, guaranties or other supporting obligations covering the Collateral,
and any causes of action relating to the Collateral. All books and records
pertaining to any Collateral including but not limited to any computer-
readable memory and any computer hardware or software necessary to
process such memory ("Books and Records").

See Exhibit C.

The description of the "Collateral" in the UCC-1 is substantially identical with that set

forth in the Security Agreement. See Exhibit B at 1.

      G.    The Bank further alleges that on or about February 1, 2010, the Debtor

and Bank entered into that certain loan modification (the "**Loan Modification**" and, with

the Loan Agreement, the Security Agreement, the UCC-1, and all related documents, the

"**Loan Documents**"). A copy of the Loan Modification is attached as Exhibit D. Among

other things, the Loan Modification reset the interest rate as "Bank's Prime Rate plus

4.00 per annum" and extended the maturity date of the Loan to January 22, 2011. Exhibit

D at 1. In addition, pursuant to the Loan Modification, the Debtor confirmed all security

interests and liens theretofore granted by Debtor to Bank. *Id.* at 2.

      H.    Pursuant to the Loan Documents, the Debtor's indebtedness to the Bank is

secured by certain collateral consisting of, among other things, valid, perfected, and first

priority liens on the Debtor's receivables (the "**Receivables**"), equipment, inventory, and

substantially all property of the Debtor, including the cash proceeds thereof.

      I.    The Bank further alleges that, as of the Petition Date, the Debtor was

indebted to the Bank in the amount of not less than $376,134.21 in principal and interest

due, plus pre-petition attorney's fees and costs and post-petition interest, attorney's fees

and costs. The term "**Bank Debt**" herein shall mean all of Debtor's indebtedness to the

Bank as of the Petition Date plus all interest and reimbursable costs and expenses to the extent permitted to the Bank under Section 506(b) of the Bankruptcy Code.

J.      After the Petition Date, the Debtor used the Bank's cash collateral to operate its business and fund chapter 11 administrative expenses without obtaining either the Bank's consent or this Court's approval as required under 11 U.S.C. § 363(c).

K.      Section 363(c)(2) of the Bankruptcy Code prohibits a trustee from using cash collateral unless each entity that has an interest in the cash collateral consents or the Court approves such use of cash collateral. Section 506(c) of the Bankruptcy Code permits a trustee to recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving or disposing of such property to the extent of any benefit to the holder of such claim.

L.      As of November 8, 2011, the Trustee possesses approximately $41,000, representing proceeds of Receivables that the Debtor had collected after the Petition Date and delivered to the Trustee after the Conversion Date less operating costs paid by the Trustee with the Bank's authorization (together with all interest accrued thereon, the "**Initial Cash Collateral**").

M.      The Bank and the Trustee desire that the Trustee retain the Initial Cash Collateral to create an initial operating fund for the Debtor's business and to fund administrative expenses for the liquidation of other Bank Collateral (as defined below) and Estate Property throughout the Chapter 7 Case. The Bank and the Trustee further desire that: (a) the Trustee be authorized to retain a portion of additional cash proceeds generated from collection of Receivables and from the liquidation of other Bank Collateral during the Chapter 7 Case (the "**Additional Cash Collateral**" and together

5

with the Initial Cash Collateral the "**Cash Collateral**") as a reserve to fund further administrative costs of the Estate while remitting to the Bank proceeds in excess of such reserve to apply to the Bank Debt; and (b) the Bank be given a lien on all property of the Debtor's Estate not currently constituting Bank Collateral, solely for purposes of securing the repayment of the Cash Collateral that the Trustee uses to fund expenses and costs that are not directly related to the preservation or liquidation of the Bank Collateral.

**WHEREFORE, THE PARTIES HERETO AGREE AND STIPULATE, AND THE COURT HEREBY ORDERS, THAT:**

1.  Pursuant to the Loan Documents, the Debtor's indebtedness to the Bank is secured by valid, perfected, and first priority liens on all of the collateral described in the Loan Documents, including the Receivables, equipment, inventory, substantially all property of the Debtor, and the cash proceeds thereof, and any Avoidance Actions as to which the Bank may be entitled to assert a security interest under the Loan Documents, but in no event including Preference Recoveries (defined below); it being understood that the Trustee disputes the validity of any security interest asserted by the Bank in any Avoidance Claims (defined below) other than actions to avoid and recover post-petition transfers of property pursuant to sections 549 and 550 of the Bankruptcy Code (collectively, the "Bank Collateral").

2.  Pursuant to section 506(c) of the Bankruptcy Code and subject to the provisions of this Agreed Order: (a) the fees, costs, and expenses of (i) the Trustee, including fees payable to the Trustee pursuant section 326 of the Bankruptcy Code, and (ii) the Trustee's Professionals; and (b) all other fees, costs, and expenses of administering the Debtor's Estate and operating the Debtor's business (collectively, the

6

"**Estate Expenses**"), as set forth in the initial monthly budget attached hereto as <u>Exhibit E</u> (initially and as revised by the Trustee each month during the term of this Agreed Order, the "Budget"), shall be paid from the Cash Collateral set aside as the Cash Collateral Reserve (as defined herein) upon the approval by the Court of the fee applications of the Trustee and the Trustee's Professionals, and for payment in the ordinary course of such Estate Expenses with respect to payment of which Court approval is not required.

3.    On the tenth day after the entry of this Agreed Order, the Trustee shall remit to the Bank all Cash Collateral it holds in excess of an initial operating reserve of $66,875.00, which amount exceeds the Budget by approximately 10% (the "**Initial Operating Reserve**").

4.    On the first business day of each month starting on December 1, 2011 or as soon as practicable thereafter, and continuing each month thereafter through the earliest to occur of the dismissal of this Chapter 7 Case, its conversion into a case under chapter 11 of the Bankruptcy Code (unless the Trustee is appointed Chapter 11 trustee as forth in paragraph 11 below), or satisfaction of the Bank Debt (such earliest date being the "**Termination Date**"), the Trustee shall revise the Budget to reflect the Trustee's estimate (the "**Estate Expenses Estimate**") of all the Estate Expenses the Trustee expects in good faith to incur within the next month to liquidate or preserve the Bank Collateral or otherwise administer the Estate and operate the Debtor's business.  The amount of each monthly Budget plus 10% of such amount shall be referred to herein as the "**Continuing Reserve**."   Also on the first business day of each month starting on December 1, 2011 or as soon as practicable thereafter, and continuing each month

7

thereafter through the Termination Date, the Trustee shall determine how much Cash

Collateral is in its possession (the **"Continuing Cash Collateral Amount"**).  If the

Continuing Cash Collateral Amount exceeds the Continuing Reserve, the Trustee shall

remit the difference (the **"Cash Surplus"**) to the Bank on or before the tenth business day

of such month.   If the Continuing Cash Collateral Amount is less than the Continuing

Reserve, the Trustee shall retain 100% of any Cash Collateral collected or received by

Trustee until there is a Cash Surplus in the applicable subsequent month. The Trustee

shall provide to Bank a report (the **"Cash Report"**) of the calculations described in this

paragraph on or before the tenth business day of the month in which such calculations are

made.  Upon request of the Bank, the Trustee shall meet and confer with the Bank

regarding any concerns, comments, or questions the Bank may have as to any Estate

Expenses Estimate or Cash Report for any period.

5.    At the earliest to occur of the dismissal of this Chapter 7 Case or its

conversion to a case under chapter 11 of the Bankruptcy Code (unless the Trustee is

appointed Chapter 11 trustee as forth in paragraph 11 herein), the Trustee, after all

outstanding and approved Estate Expenses have been paid in full, shall remit to the Bank

all of the remaining sums held in the Continuing Reserve up to the remaining amount of

the Bank Debt.  Any Cash Collateral remaining after payment of Estate Expenses and the

Bank Debt shall be retained by the Trustee for distribution in accordance with the

provisions of the Bankruptcy Code.

6.    To the extent the Trustee realizes cash proceeds from sources other than

Bank Collateral (collectively, **"Non-Bank Collateral"**), the Trustee shall use such

proceeds to pay Estate Expenses unrelated to the liquidation or preservation of Bank

Collateral before resorting to use of Cash Collateral and further shall reflect that use in any Cash Reports. Non-Bank Collateral shall not be used to preserve or liquidate Bank Collateral; to the extent any such use occurs the Trustee shall reimburse the Estate from Cash Collateral. Cash Collateral may be used to liquidate Non-Bank Collateral, provided such anticipated use is disclosed to the Bank and provided further that the Trustee shall use Non-Bank Collateral proceeds to reimburse the Cash Collateral Reserve for Cash Collateral used to liquidate such Non-Bank Collateral.

7.    For purposes hereof, **"Avoidance Claims"** shall mean all claims and causes of action of Debtor or the Debtor's estate for money or property recovered pursuant to Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, including Debtor's rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) before deduction of any costs of collecting said money or property including reasonable attorney fees and costs. For purposes hereof, **"Preference Recoveries"** shall mean any and all recoveries of money or property for the Estate pursuant to Sections 547 or 550 of the Bankruptcy Code. To the extent the Trustee uses Cash Collateral to pay attorney fees and costs incurred in collecting, pursuing or liquidating Non-Bank Collateral, including Avoidance Claims, and recovers such fees and costs from third parties, such recovered fees and costs shall be added to the Cash Collateral Reserve

8.    Pursuant to Section 363(c)(2) of the Bankruptcy Code, the Bank consents to the use of its Cash Collateral to reimburse the Estate Expenses approved by the Court, or otherwise paid in the ordinary course of operating the Debtor's business, subject to the

9

terms hereof. Solely to the extent the Trustee incurs Estate Expenses for purposes other than liquidating or preserving Bank Collateral, such as to pursue or liquidate Non-Bank Collateral, and uses Cash Collateral to pay such expenses, the Bank shall be entitled to adequate protection for such use of its Cash Collateral (the "**Adequate Protection Claim**"). To secure the Adequate Protection Claim, and solely to the extent thereof, the Bank is hereby granted a replacement lien upon all of the Debtor's property and assets, of any kind or nature whatsoever, whether now owned or hereafter acquired by the Debtor or the estate, whether part of the Bank Collateral or not, and upon all of the estate's causes of action and the proceeds thereof.

9. Nothing herein shall be deemed to prejudice or limit the Bank's right to request by motion a termination of further use of its Cash Collateral by the Trustee; provided, however, that in the event of any such termination, all Estate Expenses incurred prior to the date of such termination shall be paid (a) first from Non-Bank Collateral, solely to the extent such Expenses relate to matters unrelated to the liquidation or preservation of Bank Collateral, and only then (b) from Cash Collateral, subject only to the Bank's right to evaluate the reasonableness of Estate Expenses under the criteria of section 330 and other applicable provisions of the Bankruptcy Code.

10. The Bank reserves all of its rights to review and object to the reasonableness of the fee applications of the Trustee and the Trustee's Professionals according to the criteria set by section 330 and other applicable provisions of the Bankruptcy Code.

11. The automatic stay established by section 362 of the Bankruptcy Code shall be modified to the extent necessary to implement the provisions of this Agreed

10

Order, including the distributions to the Bank authorized hereby. The Bank shall be conclusively presumed to have requested adequate protection as of the Petition Date and the automatic stay shall be deemed lifted as to all Bank Collateral effective as of the date of the entry of this Agreed Order solely to the extent necessary to effect the express provisions hereof.

12. If, while this Agreed Order is in effect, the Chapter 7 Case is converted to a case under chapter 11 of the Bankruptcy Code and if upon such conversion the Trustee is appointed the chapter 11 trustee of the Debtor's estate in such chapter 11 case, then the terms of this Agreed Order shall remain in effect for so long as: (a) such chapter 11 trustee remains in custody of the Debtor's estate; and (b) either (i) the Bank Claim remains unsatisfied or (ii) amounts due to Bank hereunder remain unpaid.

13. This Agreed Order may be executed in any number of counterparts, each of which counterparts, when so executed and delivered (including by facsimile transmission or electronic mail), shall be deemed an original, and all of which counterparts, taken together, shall constitute one and the same Agreed Order.

14. The Trustee has provided notice of the hearing on the Agreed Order to the Debtor, the office of the United States Trustee, all of the Debtor's known secured creditors, the list of the Debtor's 20 largest unsecured creditors and all parties that have requested notice of pleadings filed in the Bankruptcy Case, which notice is approved as adequate under the circumstances.

Dated: **2 2 NOV 2011**

_____
UNITED STATES BANKRUPTCY JUDGE

11

**STIPULATED AND AGREED:**

FRANCES GECKER, As Chapter 7
Trustee For The Bankruptcy Estate Of
Collectors Institute Of Illinois, Inc.

BANK OF AMERICA, N.A.

By: ___/s/ Micah R. Krohn___
      One of her attorneys

By: ___/s/ Christopher M. Cahill___
      One of its attorneys

Frances Gecker (IL Bar No. 6198450)
Micah R. Krohn (IL Bar No. 6217164)
FRANK/GECKER LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois 60654
Telephone:   (312) 276-1400
Facsimile:    (312) 276-0035

Christopher M. Cahill (Atty No. 6257370)
LOWIS & GELLEN, LLP
200 West Adams
Suite 1900
Chicago, IL 60606
Telephone:   (312) 364-2500
Facsimile:    (312) 364-1003

# Exhibit

# A

 **Bank of America**

# Loan Agreement

Date of Agreement: October 22, 2007

| Principal Amount: | $350,000.00 | Account Number: | 23-0000114382 |
|---|---|---|---|

**Introduction.** This Agreement dated and effective as of October 22, 2007, is entered into between Collectors Training Institute of Illinois, Inc. (the "Borrower") and Bank of America, N.A. (the "Bank"). The Borrower agrees to the following terms and conditions:

**1.     LINE OF CREDIT**

**1.1     Line of Credit Amount.**

(a)     During the availability period described below, the Bank will provide a line of credit to the Borrower.  The amount of the line of credit (the "Commitment") is Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00).

(b)     This is a revolving line of credit.  During the availability period, the Borrower may repay principal amounts and reborrow them.

(c)     The Borrower agrees not to permit the principal balance outstanding to exceed the Commitment.  If the Borrower exceeds this limit, the Borrower will immediately pay the excess to the Bank upon the Bank's demand.

**1.2     Availability Period.** The line of credit is available between the date of this Agreement and October 22, 2008, or such earlier date as the availability may terminate as provided in this Agreement (the "Expiration Date").

The availability period for this line of credit will be considered renewed if and only if the Bank has sent to the Borrower a written notice of renewal effective as of the Expiration Date for the line of credit (the "Renewal Notice").  If this line of credit is renewed, it will continue to be subject to all the terms and conditions set forth in this Agreement except as modified by the Renewal Notice.  If this line of credit is renewed, the term "Expiration Date" shall mean the date set forth in the Renewal Notice as the Expiration Date, and all outstanding principal plus all accrued interest shall be paid on the Expiration Date.  The same process for renewal will apply to any subsequent renewal of this line of credit.  A renewal fee may be charged at the Bank's option.  The amount of the renewal fee will be specified in the Renewal Notice.  If this line of credit is not renewed, the Bank in its sole discretion may allow the outstanding balance to be repaid in installments over a term specified by the Bank at the time.  The Borrower specifically understands that the interest rate applicable to the line of credit may be increased upon term-out and that the new interest rate will apply to the entire outstanding principal balance due hereunder.  A transaction fee may be charged at the Bank's option.  If so, the amount will be specified in the term-out notice.

**1.3     Repayment Terms.**

(a)     The Borrower will pay interest on November 22, 2007, and then on the same day of each month thereafter until payment in full of any principal outstanding under this Agreement.

(b)     The Borrower will repay in full any principal, interest or other charges outstanding under this Agreement no later than the Expiration Date.

**1.4     Interest Rate.**

(a)     The interest rate is a rate per year equal to the Bank's Prime Rate.

(b)     The Prime Rate is the rate of interest publicly announced from time to time by the Bank as its Prime Rate.  The Prime Rate is set by the Bank based on various factors, including the Bank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans.  The Bank may price loans to its customers at, above, or below the Prime Rate.  Any change in the Prime Rate shall take effect at the opening of business on the day specified in the public announcement of a change in the Bank's Prime Rate.

AFS Loan Agreement                     -1-                          03/06



2.     **FEES AND EXPENSES**

2.1     **Fees.**

(a)     <u>Loan Fee.</u> The Borrower agrees to pay a loan fee in the amount of One Thousand Seven Hundred Fifty and 00/100 Dollars ($1,750.00). This fee is due on the date of this Agreement.

(b)     <u>Waiver Fee.</u> If the Bank, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at the Bank's option, pay the Bank a fee for each waiver or amendment in an amount advised by the Bank at the time the Borrower requests the waiver or amendment. Nothing in this paragraph shall imply that the Bank is obligated to agree to any waiver or amendment requested by the Borrower. The Bank may impose additional requirements as a condition to any waiver or amendment.

(c)     <u>Late Fee.</u> To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed four percent (4%) of any payment that is more than fifteen (15) days late. The imposition and payment of a late fee shall not constitute a waiver of the Bank's rights with respect to the default.

2.2     **Expenses.** The Borrower agrees to immediately repay the Bank for expenses that include, but are not limited to, filing, recording and search fees, appraisal fees, title report fees, documentation fees, and all fees and taxes required by law in connection with providing the credit.

2.3     **Reimbursement Costs.** The Borrower agrees to reimburse the Bank for the cost of periodic field examinations of Borrower's books, records and collateral, and appraisals of the collateral, at such intervals as the Bank may reasonably require. The actions described in this paragraph may be performed by employees of the Bank or by independent appraisers.

3.     **COLLATERAL**

3.1     **Personal Property.** The personal property listed below now owned or owned in the future by the parties listed below will secure Borrower's obligations to the Bank under this Agreement. The collateral is further defined in security agreement(s) executed by the owners of the collateral. In addition, all personal property collateral owned by the Borrower securing this Agreement shall also secure all other present and future obligations of the Borrower to the Bank (excluding any consumer credit covered by the federal Truth in Lending law, unless the Borrower has otherwise agreed in writing or received written notice thereof). All personal property collateral securing any other present or future obligations of the Borrower to the Bank shall also secure this Agreement.

(a)     Equipment and fixtures owned by the Borrower.

(b)     Inventory owned by the Borrower.

(c)     Receivables owned by the Borrower.

4.     **DISBURSEMENTS, PAYMENTS AND COSTS**

4.1     **Telephone Authorization.**

(a)     The Bank may honor telephone instructions for advances or repayments given, or purported to be given, by any one of the individuals authorized to sign loan agreements on behalf of the Borrower, or any other individual designated by any one of such authorized signers.

(b)     Advances will be deposited in and repayments will be withdrawn from account number IL - 002872460416 owned by the Borrower, or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower.

(c)     The Borrower will indemnify and hold the Bank harmless from all liability, loss, and costs in connection with any act resulting from telephone instructions the Bank reasonably believes are made by any individual authorized by the Borrower to give such instructions. This paragraph will survive this Agreement's termination, and will benefit the Bank and its officers, employees, and agents.

**4.2     Direct Debit (Pre-Billing).**

(a)     The Borrower agrees that the Bank will debit deposit account number IL - 002872480415 owned by the Borrower, or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower (the "Designated Account") on the date each payment from the Borrower becomes due (the "Due Date"). Payments include interest payments, principal payments (if applicable) and fees (if applicable).

(b)     Prior to each Due Date, the Bank will mail to the Borrower a statement of the amounts that will be due on that Due Date (the "Billed Amount"). The bill will be mailed a specified number of calendar days prior to the Due Date, which number of days will be mutually agreed from time to time by the Bank and the Borrower. The calculations in the bill will be made on the assumption that no new extensions of credit or payments will be made between the date of the billing statement and the Due Date, and that there will be no changes in the applicable interest rate.

(c)     The Bank will debit the Designated Account for the Billed Amount, regardless of the actual amount due on that date (the "Accrued Amount"). If the Billed Amount debited to the Designated Account differs from the Accrued Amount, the discrepancy will be treated as follows:

   (i)     If the Billed Amount is less than the Accrued Amount, the Billed Amount for the following Due Date will be increased by the amount of the discrepancy. The Borrower will not be in default by reason of any such discrepancy.

   (ii)    If the Billed Amount is more than the Accrued Amount, the Billed Amount for the following Due Date will be decreased by the amount of the discrepancy.

Regardless of any such discrepancy, interest will continue to accrue based on the actual amount of principal outstanding without compounding. The Bank will not pay the Borrower interest on any overpayment.

(d)     The Borrower will maintain sufficient funds in the Designated Account to cover each debit. If there are insufficient funds in the Designated Account on the date the Bank enters any debit authorized by this Agreement, the Bank may reverse the debit.

(e)     The Borrower may terminate this direct debit arrangement at any time by sending written notice to the Bank. If the Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of the Bank bear interest at a rate per annum which is one (1.0) percentage point higher than the rate of interest otherwise provided under this Agreement and the amount of each payment will be increased accordingly.

**4.3     Banking Days.** Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. All payments and disbursements which would be due on a day which is not a banking day will be due on the next banking day. All payments received on a day which is not a banking day will be applied to the credit on the next banking day.

**4.4     Interest Calculation.** Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid.

**4.5     Default Rate.** Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any interest, fees, or costs which are not paid when due, will at the option of the Bank bear interest at a rate which is 8.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

**5.    CONDITIONS**

Before the Bank is required to extend any credit to the Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to the Bank, including any items specifically listed below.

**5.1    Authorizations.** If the Borrower or any guarantor is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such guarantor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**5.2    Governing Documents.** If required by the Bank, a copy of the Borrower's organizational documents.

**5.3    Guaranties.** Guaranties signed by William Leggett ("William Leggett") and Colby Smith ("Colby Smith").

**5.4    Security Agreements.** Signed original security agreements covering the personal property collateral which the Bank requires.

**5.5    Perfection and Evidence of Priority.** Evidence that the security interests and liens in favor of the Bank are valid, enforceable, properly perfected in a manner acceptable to the Bank and prior to all others' rights and interests, except those the Bank consents to in writing. All title documents for motor vehicles which are part of the collateral must show the Bank's interest.

**5.6    Payment of Fees.** Payment of all fees, expenses and other amounts due and owing to the Bank. If any fee is not paid in cash, the Bank may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds.

**6.    REPRESENTATIONS AND WARRANTIES**

When the Borrower signs this Agreement, and until the Bank is repaid in full, the Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

**6.1    Formation.** If the Borrower is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

**6.2    Authorization.** This Agreement, and any instrument or agreement required hereunder, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational papers.

**6.3    Good Standing.** In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

**6.4    Financial Information.** All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of the Borrower's (and any guarantor's) financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower (or any guarantor). If the Borrower is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

**6.5    Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower which, if lost, would impair the Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Bank.

**6.6    Other Obligations.** The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Bank.

**6.7    Tax Matters.** The Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Bank.

**6.8    No Event of Default.** There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement.

**6.9    Collateral.** All collateral required in this Agreement is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Bank in writing.

**7.    COVENANTS**

The Borrower agrees, so long as credit is available under this Agreement and until the Bank is repaid in full:

**7.1    Use of Proceeds.** To use the proceeds of the credit only for business purposes.

**7.2    Financial Information.** From time to time as requested by the Bank, to provide the following financial information and statements in form and content acceptable to the Bank. The Bank reserves the right, upon written notice to the Borrower, to require the Borrower to deliver additional financial information and statements to the Bank, and to use such additional information and statements to measure any applicable financial covenants in this Agreement:

(a)    Copies of the federal income tax return of the Borrower and, if requested by the Bank, copies of any extensions of the filing date.

(b)    A detailed aging of the Borrower's receivables by invoice or a summary aging by account debtor.

(c)    A summary aging by vendor of accounts payable.

(d)    Debt Service Schedule.

(e)    A properly completed personal financial statement of William Leggett and Colby Smith on the Bank's form with all questions fully answered and all schedules completed in their entirety, including all requested income/expense information, contingent liabilities disclosure; provided that, if the party providing the financial information uses his/her own automated financial statement, they may supplement the statement with supporting schedules, certifications or other details so that all information requested on the Bank's financial statement form is provided in lieu of using such form.

(f)    Copies of the federal income tax return of William Leggett and Colby Smith and, if requested by the Bank, copies of any extensions of the filing date.

**7.3    Other Debts.** Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank), or become liable for the liabilities of others, without the Bank's written consent. This does not prohibit:

(a)    Acquiring goods, supplies, or merchandise on normal trade credit.

(b)    Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Bank.

(c)    If the Borrower is a natural person, additional debts of the Borrower as an individual for consumer purposes.

**7.4    Other Liens.** Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except:

(a)    Liens and security interests in favor of the Bank.

(b)    Liens for taxes not yet due.

(c)    Liens outstanding on the date of this Agreement disclosed in writing to the Bank.

**7.5    Maintenance of Assets.**

(a)    Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except in the ordinary course of the Borrower's business.

(b)    Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c)    Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d)    To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e)    To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

**7.6    Loans.** Not to make any loans, advances or other extensions of credit to any individual or entity except for extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

**7.7    Change of Management.** Not to make any substantial change in the present executive or management personnel of the Borrower.

**7.8    Change of Ownership.** If the Borrower is anything other than a natural person, not to cause, permit, or suffer any change in capital ownership such that there is a material change, as determined by the Bank in its sole discretion, in the direct or indirect capital ownership of the Borrower.

**7.9    Additional Negative Covenants.** Not to, without the Bank's written consent:

(a)    Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b)    Acquire or purchase a business or its assets.

(c)    Engage in any business activities substantially different from the Borrower's present business.

(d)    Liquidate or dissolve the Borrower's business.

**7.10    Notices to Bank.** To promptly notify the Bank in writing of:

(a)    Any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

(b)    Any change in the Borrower's name, legal structure, place of business, or chief executive office if the Borrower has more than one place of business.

**7.11    Insurance**

(a)    General Business Insurance. To maintain insurance as is usual for the business it is in.

(b)    Insurance Covering Collateral. To maintain all risk property damage insurance policies (including without limitation windstorm coverage, and hurricane coverage as applicable) covering the tangible property comprising the collateral. Each insurance policy must be for the full replacement cost of the collateral and include a replacement cost endorsement. The insurance must be issued by an insurance company acceptable to the Bank and must include a lender's loss payable endorsement in favor of the Bank in a form acceptable to the Bank.

(c)    Evidence of Insurance. Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

Unless the Borrower provides the Bank with satisfactory evidence of the insurance coverage required hereby, the Bank may purchase insurance at the Borrower's expense to protect the Bank's interest in the collateral. This insurance may, but need not, protect the interests of the Borrower. The coverage that the Bank purchases may not pay any claim that the Borrower makes or any claim that is made against the Borrower in connection with the collateral. The Borrower may later cancel any insurance purchased by the Bank, but only after providing the Bank with satisfactory evidence that the Borrower has obtained insurance as required hereby. If the Bank purchases insurance of the collateral, the Borrower will be responsible for the costs of that insurance, including interest thereon at the Default Rate and any other charges which the Bank may impose in connection with the placement of the insurance until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the outstanding principal balance of the advances, shall bear interest at the Default Rate as provided above, and shall be payable upon demand. The costs of the insurance may be more than the cost of insurance the Borrower may be able to obtain on its own.

**7.12     Compliance with Laws.** To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over the Borrower's business. The Bank shall have no obligation to make any advance to the Borrower except in compliance with all applicable laws and regulations and the Borrower shall fully cooperate with the Bank in complying with all such applicable laws and regulations.

**7.13     Books and Records.** To maintain adequate books and records.

**7.14     Audits.** To allow the Bank and its agents to inspect the Borrower's properties and examine, audit, and make copies of books and records at any reasonable time. If any of the Borrower's properties, books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform inspections or audits and to respond to the Bank's requests for information concerning such properties, books and records.

**7.15     Perfection of Liens.** To help the Bank perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

**7.16     Cooperation.** To take any action reasonably requested by the Bank to carry out the intent of this Agreement.

**7.17     Bank as Principal Depository.** To maintain the Bank as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts.

**8.     DEFAULT AND REMEDIES**

If any of the following events of default occurs, the Bank may do one or more of the following without prior notice: declare the Borrower in default, stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately. If an event which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Bank has no obligation to make advances or extend additional credit under this Agreement. In addition, if any event of default occurs, the Bank shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity. If an event of default occurs under the paragraph entitled "Bankruptcy," below, with respect to the Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

**8.1     Failure to Pay.** The Borrower fails to make a payment under this Agreement when due.

**8.2     Other Bank Agreements.** Any default occurs under any other agreement the Borrower (or any Obligor) has with the Bank or any affiliate of the Bank. For purposes of this Agreement, "Obligor" shall mean any guarantor, any party pledging collateral to the Bank, or, if the Borrower is comprised of the trustees of a trust, any trustor.

**8.3     Cross-default.** Any default occurs under any agreement in connection with any credit the Borrower (or any Obligor) has obtained from anyone else or which the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has guaranteed.

**8.4     False Information.** The Borrower or any Obligor has given the Bank false or misleading information or representations.

AFS Loan Agreement                                    -7-                                    03/06

**8.5   Bankruptcy.** The Borrower, any Obligor, or any general partner of the Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties, or the Borrower, any Obligor, or any general partner of the Borrower or of any Obligor makes a general assignment for the benefit of creditors.

**8.6   Receivers.** A receiver or similar official is appointed for any portion of the Borrower's or any Obligor's business, or the business is terminated, or, if any Obligor is anything other than a natural person, such Obligor is liquidated or dissolved.

**8.7   Revocation or Termination.** If the Borrower is comprised of the trustee(s) of a trust, the trust is revoked or otherwise terminated or all or a substantial part of the Borrower's assets are distributed or otherwise disposed of.

**8.8   Lien Priority.** The Bank fails to have an enforceable first lien (except for any prior liens to which the Bank has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

**8.9   Judgments.** Any judgments or arbitration awards are entered against the Borrower or any Obligor.

**8.10   Death.** If the Borrower or any Obligor is a natural person, the Borrower or such Obligor dies or becomes legally incompetent; if the Borrower or any Obligor is a trust, a trustor dies or becomes legally incompetent; if the Borrower or any Obligor is a partnership, any general partner dies or becomes legally incompetent.

**8.11   Material Adverse Change.** A material adverse change occurs, or is reasonably likely to occur, in the Borrower's (or any Obligor's) business condition (financial or otherwise), operations, properties or prospects, or ability to repay the credit.

**8.12   Government Action.** Any government authority takes action that the Bank believes materially adversely affects the Borrower's or any Obligor's financial condition or ability to repay.

**8.13   Default under Related Documents.** Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty.

**8.14   Other Breach Under Agreement.** A default occurs under any other term or condition of this Agreement not specifically referred to in this Article.

**9.   ENFORCING THIS AGREEMENT; MISCELLANEOUS**

**9.1   GAAP.** Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied or another basis acceptable to the Bank.

**9.2   Governing Law.** This Agreement is governed by Illinois law.

**9.3   Successors and Assigns.** This Agreement is binding on the Borrower's and the Bank's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Bank's prior consent.

**9.4   Consent to Jurisdiction.** TO INDUCE THE BANK TO ACCEPT THIS AGREEMENT, THE BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO THE BANK'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL BE LITIGATED IN COURTS HAVING SITUS IN CHICAGO, ILLINOIS. THE BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CHICAGO, ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS UPON THE BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO BORROWER AT THE ADDRESS STATED ON THE SIGNATURE PAGE HEREOF AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

**9.5   Waiver of Jury Trial.** THE BORROWER AND THE BANK EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B)

ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE BANK OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

**9.6** **Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Bank retains all rights, even if it makes a loan after default. If the Bank waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

**9.7** **Attorneys' Fees.** The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and in connection with any amendment, waiver, "workout" or restructuring under this Agreement. In the event of a lawsuit or arbitration proceeding, the prevailing party is entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator. In the event that any case is commenced by or against the Borrower under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute, the Bank is entitled to recover costs and reasonable attorneys' fees incurred by the Bank related to the preservation, protection, or enforcement of any rights of the Bank in such a case. To the extent permitted by law, as used in this paragraph, "attorneys' fees" includes the allocated costs of the Bank's in-house counsel.

**9.8** **Individual Liability.** If the Borrower is a natural person, the Bank may proceed against the Borrower's business and non-business property in enforcing this and other agreements relating to this loan. If the Borrower is a partnership, the Bank may proceed against the business and non-business property of each general partner of the Borrower in enforcing this and other agreements relating to this loan.

**9.9** **Joint and Several Liability.** If two or more Borrowers sign this Agreement, each Borrower agrees that it is jointly and severally liable to the Bank for the payment of all obligations arising under this Agreement, and that such liability is independent of the obligations of the other Borrowers.

**9.10** **One Agreement.** This Agreement and any related security or other agreements required by this Agreement, collectively:

(a)    represent the sum of the understandings and agreements between the Bank and the Borrower concerning this credit;

(b)    replace any prior oral or written agreements between the Bank and the Borrower concerning this credit; and

(c)    are intended by the Bank and the Borrower as the final, complete and exclusive statement of the terms agreed to by them.

In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**9.11** **Indemnification.** The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) this Agreement or any document required hereunder, (b) any credit extended or committed by the Bank to the Borrower hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity includes but is not limited to attorneys' fees (including the allocated cost of in-house counsel). This indemnity extends to the Bank, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of the Borrower's obligations to the Bank. All sums due to the Bank hereunder shall be obligations of the Borrower, due and payable immediately without demand.

**9.12** **Notices.** Unless otherwise provided in this Agreement or in another agreement between the Bank and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier to the addresses on the signature page of this Agreement, or to such other addresses as the Bank and the Borrower may specify from time to time in writing. Notices and other communications shall be effective

(i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

**9.13 Headings.** Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

**9.14 Counterparts.** This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement.

**9.15 Borrower Information; Reporting to Credit Bureaus.** The Borrower authorizes the Bank at any time to verify or check any information given by the Borrower to the Bank, check the Borrower's credit references, verify employment, and obtain credit reports. The Borrower agrees that the Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Borrower and/or all guarantors as is consistent with the Bank's policies and practices from time to time in effect.

This Agreement is executed as of the date stated at the top of the first page.

Bank:

Bank of America, N.A.

By: _____
    Jamillah Pointer, Assistant Vice President

Borrower:

Collectors Training Institute of Illinois, Inc.

By: _____
    William Leggett, President

By: _____
    Colby Smith, Vice President

Address where notices to the Bank are to be sent:

Bank of America, N.A.
GCIB Credit Services
1075 Main Street, 2nd Floor
Waltham, MA 02451

Address where notices to the Borrower are to be sent:

Collectors Training Institute of Illinois, Inc.
3333 W. Arlington Street, 2nd Floor
Chicago, IL 60624

## USA PATRIOT ACT NOTICE

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information. The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

## AFFILIATE SHARING NOTICE

Notice to Individual Borrowers, Guarantors and Pledgors ("Obligors"): From time to time Bank of America, N.A. (the "Bank") may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"). The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources. If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) calling the Bank at 1.888.341.5000, (2) visiting the Bank online at www.bankofamerica.com, selecting "Privacy & Security," and then selecting "Set Your Privacy Preferences," or (3) contacting the Obligor's client manager or local banking center. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number. If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only, and may take six to eight weeks to be fully effective. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates. The Bank may change this policy from time to time. Visit our website, www.bankofamerica.com, for the latest policy.

# Exhibit
# B


**Bank of America**

## SECURITY AGREEMENT
### (Multiple Use)

     1. THE SECURITY. The undersigned Collectors Training Institute of Illinois, Inc. (the "Pledgor") hereby assigns and grants to Bank of America, N.A. (the "Bank") a security interest in the following described property now owned or hereafter acquired by the Pledgor ("Collateral"):

     (a) All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to the Pledgor from a factor; rights to payment of money from the Bank under any Swap Contract (as defined in Paragraph 2 below); and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

     (b) All inventory, including all materials, work in process and finished goods.

     (c) All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by the Pledgor, (including, but not limited to, the equipment described in the attached Equipment Description, if any).

     (d) All negotiable and nonnegotiable documents of title covering any Collateral.

     (e) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

     (f) All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral.

     (g) All books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

     2. THE INDEBTEDNESS. The Collateral secures and will secure all Indebtedness of the Pledgor to the Bank. Each party obligated under any Indebtedness is referred to in this Agreement as a "Debtor." "Indebtedness" means all debts, obligations or liabilities now or hereafter existing, absolute or contingent of the Debtor or any one or more of them to the Bank, whether voluntary or involuntary, whether due or not due, or whether incurred directly or indirectly or acquired by the Bank by assignment or otherwise. Indebtedness shall include, without limitation, all obligations of the Debtor arising under any Swap Contract. "Swap Contract" means any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, these or similar transactions now or hereafter entered into between the Debtor and the Bank.

     3. PLEDGOR'S COVENANTS. The Pledgor represents, covenants and warrants that unless compliance is waived by the Bank in writing:

- 1 -


EXHIBIT B

(a) The Pledgor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b) The Pledgor resides (if the Pledgor is an individual), or the Pledgor's chief executive office (if the Pledgor is not an individual) is located, in the state specified on the signature page hereof. In addition, the Pledgor (if not an individual or other unregistered entity), is incorporated in or organized under the laws of the state specified on such signature page. The Pledgor shall give the Bank at least thirty (30) days notice before changing its residence or its chief executive office or state of incorporation or organization. The Pledgor will notify the Bank in writing prior to any change in the location of any Collateral, including the Books and Records.

(c) The Pledgor will notify the Bank in writing prior to any change in the Pledgor's name, identity or business structure.

(d) Unless otherwise agreed, the Pledgor has not granted and will not grant any security interest in any of the Collateral except to the Bank, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of the Bank.

(e) The Pledgor will promptly notify the Bank in writing of any event which affects the value of the Collateral, the ability of the Pledgor or the Bank to dispose of the Collateral, or the rights and remedies of the Bank in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f) The Pledgor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect the Bank's security interest (collectively, the "Collateral Costs"). Without waiving the Pledgor's default for failure to make any such payment, the Bank at its option may pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. The Pledgor agrees to reimburse the Bank on demand for any Collateral Costs so incurred.

(g) Until the Bank exercises its rights to make collection, the Pledgor will diligently collect all Collateral.

(h) If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, the Pledgor shall immediately deliver such document to the Bank, together with any necessary endorsements.

(i) The Pledgor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of the Bank; provided, however, that the Pledgor may sell inventory in the ordinary course of business.

(j) The Pledgor will maintain and keep in force insurance covering the Collateral against fire and extended coverages (including without limitation windstorm coverage, and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall require losses to be paid on a replacement cost basis, be issued by insurance companies acceptable to the Bank and include a loss payable endorsement in favor of the Bank in a form acceptable to the Bank. Upon the request of the Bank, the Pledgor will deliver to the bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force. Unless the Pledgor provides the Bank with satisfactory evidence of the insurance coverage required hereby, the Bank may purchase insurance at the Pledgor's expense to protect the Bank's interest in the Collateral. This insurance may, but need not, protect the interests of the Pledgor. The coverage that the Bank purchases may not pay any claim that the Pledgor makes or any claim that is made against the Pledgor in connection with the

-2-

Collateral. The Pledgor may later cancel any insurance purchased by the Bank, but only after providing the Bank with satisfactory evidence that the Pledgor has obtained insurance as required hereby. If the Bank purchases insurance of the Collateral, the Pledgor will be responsible for the costs of that insurance, including interest thereon at the highest default rate provided in the Indebtedness and any other charges which the Bank may impose in connection with the placement of the insurance until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the outstanding principal balance of the Indebtedness, shall bear interest at the default rate as provided above, and shall be payable upon demand. The costs of the insurance may be more than the cost of insurance the Pledgor may be able to obtain on its own.

(k) The Pledgor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless the Pledgor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by the Bank of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to the Bank and shall provide that the Bank has no liability to such owner, holder of any lien, or any other person.

4. ADDITIONAL OPTIONAL REQUIREMENTS. The Pledgor agrees that the Bank may at its option at any time, whether or not the Pledgor is in default:

(a) Require the Pledgor to deliver to the Bank (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b) Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c) Require the Pledgor to deliver to the Bank any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to the Bank the proceeds of any such letters of credit.

(d) Notify any account debtors, any buyers of the Collateral, or any other persons of the Bank's interest in the Collateral.

5. DEFAULTS. Any one or more of the following shall be a default hereunder:

(a) Any Indebtedness is not paid when due, or any default occurs under any agreement relating to the Indebtedness, after giving effect to any applicable grace or cure periods.

(b) The Pledgor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of the Pledgor to the Bank, and such breach remains uncured after any applicable cure period.

(c) The Bank fails to have an enforceable first lien (except for any prior liens to which the Bank has consented in writing) on or security interest in the Collateral.

(d) Any custodian, receiver or trustee is appointed to take possession, custody or control of all or a substantial portion of the property of the Pledgor or of any guarantor or other party obligated under any Indebtedness.

(e) The Pledgor or any guarantor or other party obligated under any Indebtedness becomes insolvent, or is generally not paying or admits in writing its inability to pay its debts as they become due, fails in business, makes a general assignment for the benefit of creditors, dies, or commences any case, proceeding or action under any bankruptcy or other law for the relief of, or relating to, debtors.

- 3 -

(f) Any case, proceeding or other action is commenced against the Pledgor or any guarantor or other party obligated under any Indebtedness under any bankruptcy or other law for the relief of, or relating to, debtors.

(g) Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

(h) The Pledgor has given the Bank any false or misleading information or representations.

6. **BANK'S REMEDIES AFTER DEFAULT.** In the event of any default, the Bank may do any one or more of the following, to the extent permitted by law:

(a) Declare any Indebtedness immediately due and payable, without notice or demand.

(b) Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c) Enforce the security interest of the Bank in any deposit account of the Pledgor maintained with the Bank by applying such account to the Indebtedness.

(d) Require the Pledgor to obtain the Bank's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e) Require the Pledgor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to the Bank in kind.

(f) Require the Pledgor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under the Bank's exclusive control.

(g) Require the Pledgor to assemble the Collateral, including the Books and Records, and make them available to the Bank at a place designated by the Bank.

(h) Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of the Pledgor's equipment, if the Bank deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i) Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Pledgor irrevocably authorizes the Bank to endorse or sign the Pledgor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Pledgor and remove therefrom any payments and proceeds of the Collateral.

(j) Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Pledgor.

(k) Use or transfer any of the Pledgor's rights and interests in any Intellectual Property now owned or hereafter acquired by the Pledgor, if the Bank deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Pledgor agrees that any such use or transfer shall be without any additional consideration to the Pledgor. As used in this paragraph, "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the

-4-

foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Pledgor has any right or interest, whether by ownership, license, contract or otherwise.

(l) Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Pledgor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m) Take such measures as the Bank may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Pledgor hereby irrevocably constitutes and appoints the Bank as the Pledgor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n) Without notice or demand to the Pledgor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by the Bank or any of the Bank's agents or affiliates to or for the credit of the account of the Pledgor or any guarantor or endorser of the Pledgor's Indebtedness.

(o) Exercise any other remedies available to the Bank at law or in equity.

7.    CONSENT TO JURISDICTION. TO INDUCE THE BANK TO ACCEPT THIS AGREEMENT, THE PLEDGOR IRREVOCABLY AGREES THAT, SUBJECT TO THE BANK'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL BE LITIGATED IN COURTS HAVING SITUS IN CHICAGO, ILLINOIS. THE PLEDGOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CHICAGO, ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS UPON THE PLEDGOR, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE PLEDGOR AT THE ADDRESS STATED ON THE SIGNATURE PAGE HEREOF AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

8.    WAIVER OF JURY TRIAL. THE PLEDGOR AND THE BANK EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE PLEDGOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE BANK OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

9.    MISCELLANEOUS.

(a) Any waiver, express or implied, of any provision hereunder and any delay or failure by the Bank to enforce any provision shall not preclude the Bank from enforcing any such provision thereafter.

(b) The Pledgor shall, at the request of the Bank, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as the Bank may reasonably deem necessary.

(c) All notes, security agreements, subordination agreements and other documents executed by the Pledgor or furnished to the Bank in connection with this Agreement must be in form and substance satisfactory to the Bank.

- 5 -

(d)  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. To the extent that the Bank has greater rights or remedies under federal law, whether as a national bank or otherwise, this paragraph shall not be deemed to deprive the Bank of such rights and remedies as may be available under federal law. Jurisdiction and venue for any action or proceeding to enforce this Agreement shall be the forum appropriate for such action or proceeding against the Debtor, to which jurisdiction the Pledgor irrevocably submits and to which venue the Pledgor waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith.

(e)  All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)  All terms not defined herein are used as set forth in the Uniform Commercial Code.

(g)  In the event of any action by the Bank to enforce this Agreement or to protect the security interest of the Bank in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, the Pledgor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)  In the event the Bank seeks to take possession of any or all of the Collateral by judicial process, the Pledgor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)  This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between the Bank and the Pledgor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)  The Bank's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by the Bank of any of the Indebtedness or the Collateral, the Bank thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the Bank shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred. All representations, warranties and agreements of the Pledgor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of the Pledgor.

10.  **FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

Date: October 22, 2007

BANK OF AMERICA, N.A.

By: _____

Jedillah Pointer, Assistant Vice President

Address for Notices:
Bank of America, N.A.
GCIB Credit Services
1075 Main Street, 2nd Floor
Waltham, MA  02451

Collectors Training Institute of Illinois, Inc.

By: _____

William Leggett, President

By: _____

Colby Smith, Vice President

Pledgor's Location (principal residence,
if the Pledgor is an individual;
chief executive office, if
the Pledgor is not an individual):

3333 W. Arlington Street, 2nd Floor
Chicago, IL  60624

Pledgor's state of incorporation
or organization (if Pledgor is a corporation, partnership,
limited liability company or other registered entity): Illinois

- 7 -

# Exhibit
# C

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Phone (800) 331-3282 Fax (818) 662-4141

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

UCC Direct Services
P.O. Box 29071
Glendale, CA 91209-9071

IL, Secretary of State

FILING NUMBER: 12628838

FILING DATE: 26-OCT-2007

IMAGE REFLECTS DATA FROM AN ELECTRONIC FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME COLLECTORS TRAINING INSTITUTE OF ILLINOIS, INC.

| | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 1c. MAILING ADDRESS 3333 W. ARLINGTON ST., 2ND FLOOR | CITY CHICAGO | STATE IL | POSTAL CODE 60624 | COUNTRY USA |
|---|---|---|---|---|

| 1d. TAX ID # SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION CORPORATION | 1f. JURISDICTION OF ORGANIZATION IL | 1g. ORGANIZATIONAL ID #, if any 58393622 | ☐ NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

| | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID # SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME BANK OF AMERICA, N.A.

| | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 3c. MAILING ADDRESS 1075 MAIN STREET, 2ND FLOOR | CITY WALTHAM | STATE MA | POSTAL CODE 02451 | COUNTRY USA |
|---|---|---|---|---|

4. This FINANCING STATEMENT covers the following collateral:

The following described property now owned or hereafter acquired by the Debtor ("Collateral"): All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to the Debtor from a factor; rights to payment of money from the Bank under any Swap Contract; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper. All inventory, including all materials, work in process and finished goods. All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by the Debtor, (including, but not limited to, the equipment described in the attached Equipment Description, if any). All negotiable and nonnegotiable documents of title covering any Collateral. All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral. All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral. All books and records pertaining to the Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

| 5. ALTERNATIVE DESIGNATION [if applicable] | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA 099 0000359 BB CEN

26438655

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)



EXHIBIT C

# EXHIBIT D

**Bank of America** 

## LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement dated as of February 1, 2010 (this "Amendment"), is entered into by and between Collectors Training Institute of Illinois, Inc. (whether one or several, "Borrower"); and BANK OF AMERICA, N.A. ("Bank").

### RECITALS

A. On or about October 22, 2007, (the "Origination Date"), Borrower executed certain loan documents (the "Loan Documents") in favor of Bank pursuant to which Borrower was granted a loan or line of credit (the "Loan") in the original principal amount of Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00). As used herein, the term "Loan Documents" shall mean all documents executed and delivered to Bank which evidence, secure, guaranty or relate to the Loan (as heretofore modified or amended). Bank remains the owner and holder of the Loan Documents.

B. As of February 1, 2010, the amount due under the Loan Documents is Three Hundred Fifty Two Thousand Five Twenty Eight and 94/100 Dollars ($352,528.94) consisting of principal in the amount of Three Hundred Forty Nine Thousand Three Hundred Twelve and 35/100 Dollars ($349,312.35) and accrued and unpaid interest in the amount of Three Thousand Two Hundred Sixteen and 59/100 Dollars ($3,216.59).

C. Borrower and Bank wish to amend the Loan Documents as set forth in this Amendment.

### AGREEMENT

Now, therefore, in consideration of the premises and the mutual agreements contained herein, the parties agree as follows:

1. **AMENDMENT TO LOAN DOCUMENTS.** The Loan Documents are amended as follows.

    1.1 The maturity date is changed to: January 22, 2011.

    1.2 Effective February 1, 2010, the interest rate is changed to Bank's Prime Rate plus 4.00 per annum. The Prime Rate is the fluctuating rate of interest established by Bank from time to time, at its discretion, whether or not such rate shall be otherwise published. The Prime Rate is established by Bank as an index and may or may not at any time be the best or lowest rate charged by Bank on any loan.

    1.3 Effective February 01, 2010, the payment terms are changed as follows: 12 monthly payments of fixed principal in the amount of $4,109.55, plus accrued interest, beginning on February 22, 2010, and continuing on the same day of each successive month until January 22, 2011 on which date all unpaid principal, interest and fees will be due and payable.

    1.4 Effective February 1, 2010 no further requests for advances under the Loan Documents will be honored by the Bank.

All other terms, conditions and covenants contained in the Loan Documents shall be and remain in full force and effect.

2. **REPRESENTATIONS AND WARRANTIES.** In order to induce Bank to enter into this Amendment Borrower hereby represents and warrants to Bank that except as has been previously disclosed in writing by Borrower to Bank: i) all of the representations and warranties set forth in the Loan

1

Documents are true and correct on and as of the date of this Amendment and are hereby reaffirmed in all respects; ii) no default has occurred under the Loan Documents; iii) no event, which, with the giving of notice or lapse of time or both, would cause a default under the Loan Documents has occurred and is continuing; and iv) since the Origination Date there has been no material adverse change in the financial condition or business operations of the Borrower except as may have been previously disclosed by Borrower to Bank in writing. Further, Borrower hereby represents and warrants to Bank that the individuals signing this Amendment on behalf of Borrower are duly authorized by Borrower to enter into this Amendment.

3.      **CONDITIONS PRECEDENT.** This Amendment shall become effective (the "Effective Date") when:

3.1  This Amendment has been executed by Borrower and Bank;

3.2  All actions required to be taken by Borrower in connection with the transactions contemplated by this Amendment have been taken in form and substance satisfactory to Bank;

3.3  Bank has received counterpart originals of this Amendment executed by all parties listed on the signature page(s) hereto and originals or certified or other copies of such other documents as Bank may reasonably request.

3.4  Borrower shall be in compliance with all other terms and conditions of the Loan Documents other than as specifically provided herein.

3.5  Borrower shall have paid Bank a Modification Fee in the amount of One Thousand and 00/100 Dollars ($1,000.00).

3.6  Borrower shall have paid Bank past due interest as of February 16, 2010 the amount of Three Thousand Six Hundred Eighty Nine and 61/100 Dollars ($3,689.61).

4.      **CONFIRMATION OF COLLATERAL/FURTHER ASSURANCES.** If the Loan is secured, Borrower hereby: i) confirms to Bank all security interests and liens heretofore granted by it to Bank securing the obligations of Borrower to Bank arising out of the Loan Documents; ii) acknowledges and agrees that all such obligations shall continue to be secured by any and all such security interests and liens except as expressly provided herein; and iii) at Borrower's sole cost and expense, agrees to execute and deliver to Bank any and all agreements and other documentation and to take any and all actions reasonably requested by Bank at any time to assure the perfection, protection, and enforcement of Bank's rights under the Loan Documents as amended hereby with respect to all such security interests and liens.

5.      **REAFFIRMATION.** Except as modified hereby, all of the terms, covenants, and conditions of the Loan Documents are ratified, reaffirmed, and confirmed and shall continue in full force and effect. Should any term or provision of the Loan Documents conflict with the terms or provisions contained in this Amendment the terms and provisions of this Amendment shall be controlling. This Amendment is not intended to be, nor shall it be construed to be, a novation or an accord and satisfaction of any other obligation or liability of Borrower to Bank.

6.      **BINDING EFFECT.** This Amendment shall be binding upon Borrower, Bank, and their respective successors and assigns, and shall inure to the benefit of Borrower, Bank, and their respective successors and assigns; provided, however, that Borrower may not assign this Amendment, the Loan Documents, or its rights arising out of any agreements or instruments relating thereto without Bank's prior written consent, and any prohibited assignment shall be null and void. The Bank may, without notice to or consent of any person, sell, assign, securitize, grant a participation in or otherwise dispose of all or any portion of the Loan Documents. In the event that Bank seeks to sell, assign, securitize or participate interests in all or any part of the Loan, then Borrower and, if any, all guarantors hereby authorize Bank to release all or part of any financial or credit information provided by any of them to Bank to any such banks, insurance companies, pension funds, trusts or other institutional Banks or entities, parties or investors without notice to Borrower or guarantors.

2

7.   COUNTERPARTS; EFFECTIVENESS.  This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts. Each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. This Amendment shall be deemed to have been executed and delivered on the Effective Date.

8.   AMENDMENT AND WAIVER.  No amendment or waiver of any one or more of the provisions hereof shall be effective unless set forth in a writing and signed by the parties hereto.

9.   GOVERNING LAW.  This Amendment shall be governed by and construed in accordance with the internal laws of the state provided for in the Loan Documents without reference to conflict of law principles.

10.   SEVERABILITY.  Any provision of this Amendment that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void, or invalid without affecting the remaining provisions in that or any other jurisdiction, and to this end the provisions of this Amendment are declared to be severable.

11.   RELEASE. As a material part of the consideration for Bank entering into this Amendment, Borrower and, if any, each guarantor or owner of collateral signing this Amendment, (collectively "Releasor") agree as follows (the "Release Provision"):

11.1  Releasor hereby releases and forever discharges Bank and Bank's predecessors, successors, assigns, officers, managers, directors, shareholders, employees, agents, attorneys, representatives, parent corporations, subsidiaries, and affiliates (hereinafter all of the above collectively referred to as "Bank Group"), jointly and severally from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions and causes of action of any nature whatsoever, including, without limitation, all claims, demands, and causes of action for contribution and indemnity, whether arising at law or in equity, whether presently possessed or possessed in the future, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether presently accrued or to accrue hereafter, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which Releasor may have or claim to have against any of Bank Group; provided, however, that Bank shall not be released hereby from any obligation to pay to Releasor any amounts Releasor may have on deposit with Bank, in accordance with applicable law and the terms of the documents establishing any such deposit relationship.

12.   FINAL AGREEMENT.  THIS WRITTEN AMENDMENT REPRESENTS THE FINAL AGREEMENT BETWEEN AND AMONG THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BETWEEN OR AMONG THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN OR AMONG THE PARTIES.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered as of the day and year first above written.

BANK OF AMERICA, N.A.

By: _____
Thad Vanhell, Assistant Vice President

Collectors Training Institute of Illinois, Inc.

By: _____
William Leggett, President

By: _____
Colby Smith, Vice President

Each of the undersigned guarantors/owners of collateral:  i) consents to and joins in the above Amendment (including without limitation any Release Provision); ii) warrants and covenants to Bank that, except to the extent previously disclosed to Bank in writing, all representations and warranties previously made by it to Bank are true, complete, and accurate as of the date of this Amendment; and iii) confirms to Bank all security interests and liens heretofore granted by it to Bank.

GUARANTOR

_____
William Leggett

_____
Colby Smith

Ref · 1000296497 . - Collectors Training Institute of Illinois, Inc
Loan Modification Agreement

# EXHIBIT E

## COLLECTORS TRAINING INSTITUTE OF ILLINOIS
### ESTIMATED MONTHLY BUDGET
November 1, 2011 through January 31, 2012

I. Employee Costs

A. Wages

| | Hours (two-week) | Rate | Bi-weekly Payroll | Monthly Payroll |
|---|---|---|---|---|
| William Leggett | 80.00 | $48.75 | $3,900.00 | $7,800.00 |
| Laura Cannon | 80.00 | $10.00 | $800.00 | $1,600.00 |
| Zachary Fields | 96.00 | $11.00 | $1,056.00 | $2,112.00 |
| Patrick Ford | 96.00 | $10.35 | $993.60 | $1,987.20 |
| Natalie Johnson | 80.00 | $13.00 | $1,040.00 | $2,080.00 |
| Natasha McClinton | 18.00 | $17.00 | $306.00 | $612.00 |
| Christina Ramos | 96.00 | $9.00 | $864.00 | $1,728.00 |
| Yollonda Thames | 80.00 | $10.35 | $828.00 | $1,656.00 |
| Lonnie Upshaw | 20.00 | $35.00 | $700.00 | $1,400.00 |
| Dana Williams | 60.00 | $23.35 | $1,401.00 | $2,802.00 |

Total (includes Employee Taxes)    $11,888.60    $23,777.20

B. Payroll Taxes

| | Bi-weekly Payroll | Monthly Payroll |
|---|---|---|
| Unemployment Tax | $100.00 | $200.00 |
| State Taxes | $400.00 | $400.00 |
| Federal Taxes | $750.00 | $1,500.00 |

C. ADP Costs

| | Bi-weekly Payroll | Monthly Payroll |
|---|---|---|
| | $269.00 | $414.00 |

**TOTAL EMPLOYEE COSTS:    $13,407.60    $26,291.20**

- 1 -

Doc #28778

## COLLECTORS TRAINING INSTITUTE OF ILLINOIS
### ESTIMATED MONTHLY BUDGET
**November 1, 2011 through January 31, 2012**

### II. Operating Expenses

| | Monthly Expenses |
|---|---|
| Rent | $4,322.40 |
| Telephone | $1,500.00 |
| Internet | $500.00 |
| ComEd | $600.00 |
| Post Office Box | $50.00 |
| Shredding | $75.00 |
| Messenger | $180.00 |
| Worker's Comp Insurance | $400.00 |
| CMCO | $2,132.86 |
| Letter Production | $4,500.00 |
| IPFS Insurance | $1,244.35 |
| PIMS Software License | $2,250.00 |
| Tech Services - PCG | $2,000.00 |
| First Data - Skip Tracing | $1,000.00 |
| **TOTAL OPERATING EXPENSES:** | **$20,754.61** |

### III. Professional Fees

| | Monthly Fees |
|---|---|
| Curtis Meeks | $1,000.00 |
| Frank/Gecker LLP | $5,000.00 |
| Accountant | $2,000.00 |
| Trustee Fee | $5,750.00 |
| **TOTAL PROFESSIONAL FEES:** | **$13,750.00** |

| | |
|---|---|
| **TOTAL MONTHLY BUDGET:** | **$60,795.81** |

Doc #28778